**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOYCE ANN HOWELL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 10-cv-1302 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

June 28, 2011

**I.      Introduction**

Pending before the Court are Plaintiff's MOTION FOR SUMMARY JUDGMENT (Document No. 6) and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 9). Plaintiff, Joyce Ann Howell, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied her applications for supplemental security income ("SSI") and disability insurance benefits ("DIB") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403; 1381-1383(f).

## II.      Background

### A.      Facts

Plaintiff, 53, was born on September 30, 1957 (R. 53) and graduated from New Brighton High School in 1975. (R. 45, 145). After receiving her diploma, Plaintiff entered into the workforce as a secretary (R. 47) and has since worked sporadically.

The record details Plaintiff's relevant work experience beginning in 1993. From March 1993 until April 1996, Plaintiff worked at Aliquippa Hospital in Pennsylvania, preparing food in the cafeteria and delivering carts. (R. 201). In April 1996, Plaintiff took a similar job at the Beaver Medical Center in Beaver, Pennsylvania (R. 201), where she worked until November 1997. (R. 201). Plaintiff then resigned from her job at the Medical Center after the death of her husband. (R. 201). The record reflects that Plaintiff worked as a cashier and clerk at Giant Eagle from 1999 until 2000, and as a counter clerk at a dry cleaner during 2002. (R. 159-161). She also worked at Denny's Restaurant and Shop and Save in 2001. (R. 414). However, the record is inconsistent regarding the time periods Plaintiff held the positions at Giant Eagle, the dry cleaner, Denny's, and Shop and Save.

In February 2004, Plaintiff began working as a dishwasher and hostess at Jerry's Restaurant in Aliquippa, until May 2007, when she was "let go" for missing work due to an extended hospitalization after suffering a seizure. (R. 201). Finally, the record reflects that from May 2007 until December 2007, Plaintiff worked at the Salvation Army as a clothing sorter and men's pricer, when she was again released from her employment after suffering a seizure. (R. 201).

Plaintiff alleges disability as of January 20, 2006 (R. 9), due to having a diagnosed seizure disorder. (R. 59). The record reflects that Plaintiff has not engaged in substantial gainful work activity since January 2006. (R. 11).

Plaintiff has a family history of seizures, including "a maternal cousin who died in his twenties from seizures." (R. 463). Plaintiff's first seizure occurred at age sixteen (16) and she experienced a second seizure at age twenty-eight (28). (R. 50). She testified that, beginning in 1996, the seizures grew increasingly more frequent after the death of her parents in 1996 and 1997, and the death of her husband in 1998. (R. 50). Plaintiff also testified to anywhere between zero (0) and five (5) seizures per month; however two (2) seizures a month was the norm. (R. 51). These seizures take the form of both full seizures and "mini-seizures" (R. 51). Plaintiff described that her full seizures cause her to "fall [over] and convulse and shake[.]" (R. 50). She further stated that the "mini-seizures" cause her to "shake, but I don't go completely out[.]" (R. 50). Plaintiff testified that "mini-seizures" are the most frequent of her seizures, during which she becomes confused, tired, and sleeps for hours. (R. 51). Plaintiff has been prescribed anti-seizure medications. She takes one hundred (100) milligrams of Dilantin[1] three (3) times a day and fifty (50) milligrams of Topamax four (4) times a day. (R. 49).

Plaintiff testified that although she takes anti-seizure medication, she nevertheless continues to experience multiple seizures each month. (R. 51). Medical records detail Plaintiff's seizures dating back to 1998. (R. 11). One such seizure occurred on May 28, 1998,

_____

1. Dilantin levels in Plaintiff's medical records are referred to as Phenytoin. (R. 286).

for which she was hospitalized for a short time (R. 425). This seizure is noted in an interoffice correspondence dated November 13, 1998, by Dr. Thomas M. Dugan (R. 424), who noted that Plaintiff told him she had experienced three (3) seizures during the five (5) months since their initial meeting in May 1998. (R. 422). Plaintiff told Dr. Dugan that after one of the seizures, she was taken to the emergency room by ambulance. (R. 422). Dr. Dugan noted, however, that "there is . . . a possibility that these [seizures] could be drug withdrawal seizures."[2] (R. 432).

Similarly, in an interoffice correspondence dated October 5, 1999, Dr. Dugan noted that the Plaintiff reported having "several seizures" since their meeting in November 1998, with the most recent occurring on in September 1999. (R. 421). Dr. Dugan noted that Plaintiff admitted to having one glass of alcohol on the day of her seizure in September 1999. (R. 421).

Three (3) years later, in a report dated May 17, 2002, Dr. Maria Simbra wrote that Plaintiff was shopping in Giant Eagle and collapsed due to a seizure, which lasted for five (5) minutes. (R. 412). Dr. Simbra noted that Plaintiff admitted to drinking alcohol the day prior to the seizure. (R. 412). She also noted that Plaintiff's Dilantin level was therapeutic[3] and that the "seizure was most likely related to the alcohol level decreasing in her blood stream." (R. 413).

---

2. Plaintiff has a history of alcohol, drug, and Dilantin abuse. (R. 416).
3. A therapeutic level of Dilantin (Phenytoin) is between 10.0 and 20.0 ug/ml. (R. 286).

Furthermore, in a consult report dated April 1, 2003, Dr. Kevin Altman wrote that the Plaintiff had a seizure the day before. (R. 406). She was heard screaming by her family, but she did not remember anything regarding the seizure until she woke up in the hospital. (R. 406). Upon admission to the hospital and examination, Plaintiff's Dilantin level was at a therapeutic level and her blood-alcohol level was zero (0). (R. 407). About three weeks later, on April 23, 2003, Plaintiff was found unresponsive in the waiting room of Dr. Simmon Wilcox. (R. 404). A toxicology screen showed that Plaintiff tested positive for opiates and benzodiazepine agents, and had a Dilantin level of 26.2 ug/ml, which is un-therapeutic. (R. 404).

Plaintiff had a fifteen (15) minute seizure in Giant Eagle on April 16, 2005 observed by several witnesses. (R. 278). The record reflects that the hospital collected Plaintiff's blood, which test results show that Plaintiff's Dilantin level was a therapeutic 17.9 ug/ml, suggesting that she had been taking her medication the day of the seizure (R. 286). Furthermore, there is no suggestion in the record that Plaintiff was under the influence of alcohol or drugs at the time of this seizure. The record also suggests that Plaintiff was not aware of her surroundings until a half an hour after her admission to the emergency room (R. 279).

Plaintiff continued to complain about seizures, and in an interoffice correspondence dated May 12, 2005, Dr. Altman wrote that Plaintiff told him she continued to have "mini-seizures" and had at least two "major seizures" a month. (R. 398). She also informed Dr. Altman that she had a seizure in Giant Eagle, blacked out, and was incontinent

of urine. (R. 398). Plaintiff also informed Dr. Altman that in December 2005, she had a seizure and was taken to Aliquippa Community Hospital, where she had another seizure, of which there is no mention in Plaintiff's medical record. (R. 394). Dr. Altman, in a correspondence dated July 31, 2006, noted that Plaintiff told him she had been sick at the time of her seizure, but Plaintiff did not know if she was taking any antibiotics. (R. 394). Dr. Altman noted Plaintiff's seizure in December 2005 may have been "due to something else such as concurrent antibiotic use, which might have lowered the seizure threshold." (R. 395).

Although Plaintiff complained of numerous seizures between 2006 and the present, only four such seizures are documented in her medical records.[4] (R. 207, 338, 342, 437). The first of these seizures occurred on January 14, 2006. (R. 325). The Plaintiff "had two episodes of seizures and was subsequently brought to the emergency room." (R. 325). Dr. Narayan Shetty, who consulted and examined Plaintiff on a number of occasions, stated that although Plaintiff has a history of alcohol abuse, there was no evidence that she was under the influence at the time, and her Dilantin level was 12.2 ug/ml, which is within the therapeutic range. (R. 326). Over a year later, on November 27, 2007, Plaintiff's second post-2006 seizure of record occurred. (R. 206). This seizure lasted ten (10) minutes and occurred while Plaintiff was shopping. (R. 227). Plaintiff again became incontinent of feces. (R. 227). Plaintiff's medical records show that she admitted to drinking alcohol, which according to Dr. Shetty may have "exacerbated" her seizure disorder (R. 206-207), but Plaintiff's blood-

---

4. The pre-2006 seizure activity has been given as background. The seizures prior to January 20, 2006 are subject to another claim and "are considered res judicata as there is a prior decision covering that period." (R. 9).

alcohol level was "undetectable." (R. 227). However, Dr. Shetty noted that Plaintiff's

Dilantin level was elevated to an un-therapeutic level of 31.1 ug/ml. (R. 206, 232).

Plaintiff's third post-2006 seizure of record took place on April 11, 2008 in the

Aliquippa Giant Eagle. (R. 342). On her way to the Commonwealth Medical Center Plaintiff

"vomited [a] 'blood clot'." (R. 343). Plaintiff's medical records for this incident state that her

Dilantin levels were less than 0.4 ug/ml, which is an un-therapeutic level to treat her seizures.

(R. 346). Plaintiff stated that she believed she had been taking her medication, but was not

entirely sure. (R. 346).

Her fourth post-2006 seizure of record took place on January 6, 2009, again at

Giant Eagle. (R. 432). This seizure lasted about twenty-to-thirty (20-30) seconds and was

witnessed by other customers. (R. 432). Plaintiff's medical records reflect that the seizure

may have again been caused by sub-therapeutic levels of her medication. (R. 438).

In a letter to Dr. Shetty, dated November 2, 2009, Dr. Carey makes the assessment

that Plaintiff "has a poorly controlled partial onset seizure disorder." (R. 464). Similarly, Dr.

Carey's letter dated December 9, 2009 to Dr. Shetty contains an assessment that Plaintiff's

seizure disorder is "not fully controlled on medication." (R. 454). This letter also details that

Plaintiff informed Dr. Carey that she suffered a seizure two days after Thanksgiving 2009.

(R. 454). Dr. Carey wrote that Plaintiff "felt herself getting dizzy," "she could not think

properly during the spell but did not lose total consciousness," and "electrodiagnostic studies

. . . revealed the presence of a sensory polyneuropathy." (R. 454).  Dr. Carey also noted that

Plaintiff's Dilantin level was a therapeutic 11 ug/ml a week prior to her seizure.[5] (R. 454).

The record reflects that Plaintiff can perform physical activities with little problem.

Plaintiff states that she can lift, stand, and walk for extended periods of time. (R. 160-161).

However, Plaintiff testified that when she has a seizure she become confused, disoriented,

and extremely tired which makes her sleep for extended periods of time after each episode.

(R. 51).  It should also be noted that EEG's and MRI's performed on Plaintiff throughout her

duration of treatment and hospitalizations document no significant or relevant problems. (R.

429).

**B.** **Procedural History**

Plaintiff initially filed applications for SSI and DIB on December 28, 2007, in

which she claimed total disability since January 20, 2006. (R. 9).  An administrative hearing

was held on December 30, 2009 (R. 19) before Administrative Law Judge David J. Kozma

("ALJ"). (R. 14). Plaintiff was represented by counsel and testified at the hearing.  Samuel

Edelmann, an impartial vocational expert ("VE"), also testified at the hearing. (R. 54-56).

On January 29, 2010, the ALJ rendered an unfavorable decision to Plaintiff, in

which he found that Plaintiff retained the ability to perform a wide range of light exertional

activity and, therefore, was not "disabled" within the meaning of the Act. (R. 14).  In

---

5. Plaintiff was also hospitalized during this time period in July 2005 for a burn after falling while carrying boiling water (R. 287, 396), two times in January 2006, once for a fall while intoxicated (R. 295) and once for respiratory distress. (R. 303). Plaintiff was also hospitalized after another fall in February 2006 (R. 221-222), and again hospitalized in December 2006 for depression. (R. 258).  In September 2006 she was involuntarily committed after threatening to kill herself and an unborn grandchild. (R. 249, 273).

reaching that conclusion, the ALJ stated that the four post-2006 seizures within her medical records "is the extent of her seizure activity." (R. 11). He further stated, "[t]here is no evidence that the claimant's seizures are uncontrolled." (R. 12). Similarly, the ALJ rejected the opinions of Dr. Shetty and Dr. Carey that Plaintiff was permanently disabled, stating that their opinions were "inconsistent with the medical record." (R. 12). Each of these statements was made by the ALJ without further explanation. The ALJ made no reference to the two (2) letters sent by Dr. Carey that Plaintiff's seizure disorder is not controlled. The ALJ's decision became the final decision of the Commissioner on August 23, 2010, when the Appeals Council denied Plaintiff's request to review the decision. (R. 1-3).

On October 10, 2010, Plaintiff filed her Complaint in this Court in which she seeks judicial review of the decision of the ALJ. The parties have filed cross-motions for summary judgment. Plaintiff contends that the ALJ erred in ignoring the opinion of the VE, Plaintiff's testimony, and credible medical evidence that the Plaintiff's seizures were not medically controlled. The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence.

### III.    Legal Analysis

#### A.    Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The Supreme Court has

defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Capato v. Commissioner of Social Security*, 631 F.3d 626, 628 (3d Cir. 2010) (internal citation omitted). It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Commissioner of Social Security*, 625 F.3d 798 (3d Cir. 2010).

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied.*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'n of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999).

## B.    Discussion

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. See 42 U.S.C. § 404.1520; *Newell v. Commissioner of Social Security*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Halter*, 247 F.2d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1) (1982).

This may be done in two ways:

> (1)  by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1.  *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or,

> (2)  in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005); Newell, 347 F.3d at 546; Jones, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Commissioner of Social Security*, 577 F.2d 500, 502 (3d Cir. 2010); 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.")

In making his determination, the ALJ first concluded that "the [Plaintiff] has not engaged in substantial gainful activity since January 20, 2006, the alleged onset date." (R. 11). Although Plaintiff had held a job at the Salvation Army for eight (8) months during 2007, this employment was not considered substantial gainful activity. [6] (R. 11). The ALJ next concluded that Plaintiff has a seizure disorder, which is a severe impairment. (R. 11). Furthermore, the ALJ determined that "the [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listing impairments in 20 CFR Part 404, Subpart P, Appendix 1" because, the ALJ stated, "[t]here is no evidence that the claimant's seizures are uncontrolled." (R. 12).

---

6. The ALJ determined that although Plaintiff was working after January 2006, her work at the Salvation Army did not constitute substantial gainful activity, but rather was "indicative of her ability to work." (R. 12). However, Plaintiff also worked at Jerry's until May 2007, which falls within the time period Plaintiff alleges she was disabled. (R. 201). The ALJ makes no reference to this employment in regards to whether this was a substantial gainful activity.

Subsequently, the ALJ determined that Plaintiff has the residual functional capacity to perform at a full range of exertional levels, but with certain non-exertional limitations such as being exposed to heights, climbing, or dangerous machinery. (R. 12). The ALJ considered the July 2, 2008 assessment of Plaintiff by Dr. Newman, who concluded that although Plaintiff has a seizure disorder, "she remained able to understand, retain, and follow instructions, interact with others, and perform tasks." (R. 12). The ALJ also rejected both testimony and statements from the Plaintiff, stating that her statements are "not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (R. 13). Similarly, the ALJ rejected without explanation the opinions of Dr. Shetty and Dr. Carey because their opinions were "inconsistent with the medical record." (R. 12).

Based upon the testimony of the VE that Plaintiff could perform any previous employment, as well as other employment if her seizures were controlled, the ALJ concluded that, based upon Plaintiff's age, education, work experience, and residual functional capacity, there are certain jobs within the national economy which she can perform so long as the proper seizure precautions are taken. (R. 14). Thus, having found that "[t]here is no evidence that the [Plaintiff's] seizures are uncontrolled[,]" the ALJ concluded that Plaintiff can perform these jobs and is not disabled. (R. 12, 14). However, in this case it is unclear whether the ALJ determined that Plaintiff was not disabled within the meaning of the Act at the fourth or the fifth step of the sequential evaluation process. [7]

---

7. In paragraph six (6) of the ALJ's decision, he states that "[t]he claimant is unable to perform any past relevant work[.]" The ALJ lists the Plaintiff's past relevant work as a hotel cleaner, sales attendant, or lottery ticket clerk (R.

There is a discontinuity between the VE's testimony and the ALJ's determination. The VE testified that *if* Plaintiff's seizure disorder was controlled, she could perform all the jobs she had in the past. (R. 55). The ALJ stated, in his opinion, that "[t]here is no evidence that the [Plaintiff's] seizures are uncontrolled." (R. 12). In other words, the ALJ believed that her seizures are controlled. However, the ALJ determined in paragraph six (6) of his opinion that Plaintiff is "unable to perform any past relevant work[,]" which is in direct contradiction of the VE's testimony. Not only did the ALJ fail to explain *how* he implemented the VE's testimony in reaching his determination, but the ALJ also incorrectly applied the VE's testimony regarding Plaintiff's ability to perform her past work. (R. 13-14).

After a careful review of the entire record, the Court finds that the ALJ failed to consider and/or explain his rejection of relevant, probative evidence, specifically employment assessment forms, which state that Plaintiff is permanently disabled, from Dr. Shetty, one of Plaintiff's consulting physicians who examined her on numerous occasions (R. 449-450), and Dr. Carey, Plaintiff's treating physician and neurologist (R. 451-452); a letter from Dr. Carey to Dr. Shetty, dated November 2, 2009, stating that Plaintiff "has a poorly controlled partial onset seizure disorder[,]" (R. 463-464); and another letter from Dr. Carey dated December 9, 2009, stating that Plaintiff "has a seizure disorder that is not fully controlled on medication."

---

13). Furthermore, in paragraph ten (10) the ALJ states that "[t]he vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as handler in a hospital (light, unskilled); counter clerk at a dry cleaner (medium, unskilled); cashier (light, unskilled); and Salvation Army Worker (light, unskilled)." (R. 13-14). However, the jobs listed by the ALJ in paragraph six (6), Plaintiff's past relevant work, are the jobs which the VE testified that the Plaintiff could perform if her seizures were controlled by medication. (R. 55). These jobs are not the Plaintiff's past relevant work. Rather, the jobs listed in paragraph ten (10), pertaining to the jobs that exist in the national economy, are actually the Plaintiff's past relevant work. (R. 13).

(R. 454). Because the ALJ determined that there was "no evidence" in the record that Plaintiff's seizures were uncontrolled (R. 12), and either did not consider and/or did not explain his consideration of the above mentioned documents, this matter will be remanded to the Commissioner for reconsideration, rehearing, and/or further proceedings consistent with this Memorandum Opinion. 42 U.S.C. § 405(g); *Benton v. Bowen,* 820 F.2d 85, 89 (3d Cir. 1987).

1. *The ALJ rejected the Plaintiff's treating physicians' opinions, without proper explanation as to why the opinions were not considered.*

Plaintiff argues that the ALJ ignored the opinions of two treating physicians which contradict the ALJ's determination that the Plaintiff is not disabled within the meaning of the Act. Specifically, Plaintiff argues that the ALJ did not consider from Dr. Carey's documented assessments that Plaintiff's seizure disorder is not medically controlled (R. 454). Plaintiff further contends that the ALJ did not properly consider the opinions of Dr. Carey and Dr. Shetty, each of whom personally examined Plaintiff and found that Plaintiff is permanently disabled. (R. 449-452).

On the other hand, the Commissioner argues that the decision by the ALJ should stand and that the Plaintiff is not disabled. The Commissioner contends that the opinion of the Plaintiff's treating physician is not dispositive of the issue of whether the Plaintiff is disabled. The Commissioner further argues that the opinions of Dr. Shetty and Dr. Carey that

Plaintiff is disabled and that her seizure disorder is not controlled, were properly given no weight because the documents containing these opinions were check-off boxes and fill-in-the-blanks. The Commissioner argues that the doctor's opinions were properly rejected because they were not supported by the Plaintiff's medical records and the doctors failed to explain why the Plaintiff's seizure disorder prevented her from working.

The United States Court of Appeals for the Third Circuit has found that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence." *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). Moreover, "[a]n ALJ 'may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'" *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (brackets in original) (quoting *Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir. 1983)). When the opinion of a treating physician, or any other relevant evidence, is rejected on the basis of contradictory medical evidence, the ALJ must provide an explanation why such evidence has been rejected. *See Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981); *see e.g. Kennedy v. Richardson*, 454 F.2d 376 (3d Cir. 1972). Such an explanation is required "so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 707.

Both Dr. Shetty and Dr. Carey prepared "employment assessment forms," in which they each indicated that Plaintiff was "permanently disabled" by checking the appropriate box and signing the form. (R. 449-452). Although the opinion of a doctor who has treated the

Plaintiff must be given great weight, "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence [of actual disability] at best." *Mason*, 994 F.2d at 1065 (brackets added).

However, these forms are supported by two (2) letters from Dr. Carey to Dr. Shetty (R. 454, 463). In his first letter to Dr. Shetty, dated November 2, 2009, Dr. Carey stated that Plaintiff "has a poorly controlled partial onset seizure disorder." (R. 464). In another letter to Dr. Shetty dated December 9, 2009, Dr. Carey concluded that Plaintiff's seizure disorder "is not fully controlled on medication." (R. 454).

The ALJ makes no reference to these letters or to the opinions of Dr. Carey and Dr. Shetty that Plaintiff is permanently disabled and that her seizure disorder is not controlled by medication. Furthermore, the ALJ did not point to any contrary medical evidence that would suggest Plaintiff is not permanently disabled or that her seizure disorder is controlled. The full extent of the ALJ's explanation for disregarding the opinions of the two (2) doctors is that "the opinions contained in Exhibits 16F and 17F as inconsistent with the medical record." (R. 12). Without any explanation as to why the ALJ rejected these medical opinions, this Court is unable to determine whether the consideration or rejection was proper. *See Cotter*, 642 F.2d at 707.

2. *The ALJ failed to analyze the complete record of Plaintiff's seizure activity.*

The ALJ failed to analyze the complete record of Plaintiff's seizure activity.  He further failed to explain his rationale in rejecting relevant evidence of record when making his determinations.  Specifically, the ALJ did not explain his rationale when he rejected relevant evidence pertaining to the extent of Plaintiff's seizure activity and that Plaintiff's seizure disorder is controlled.

The ALJ stated Plaintiff's seizures on January 14, 2006, November 27, 2007, April 11, 2008, and January 6, 2009 are "the extent of [Plaintiff's] seizure activity." (R. 11).  However, upon further review of the record, there are a number of documents in the record which may lead one to determine that the ALJ's statement is not supported by substantial evidence.  In fact, it is manifestly incorrect that the four post-2006 seizures represent "the extent of [Plaintiff's] seizure activity." (R. 11).  Not only does Plaintiff have a family history of seizures and a personal history of far more than four seizures, but the record details a number of instances where Plaintiff experienced seizures prior to 2006. (R. 278-279, 404, 406, 421-422).  The ALJ made no references to these instances, and did not explain his reasoning in disregarding these recorded instances of seizures.  The Court recognizes that the seizures prior to 2006 are subject to a prior decision; however these seizures are additional examples of Plaintiff's seizure activity outside of the ALJ's assessment.  The ALJ is required to provide some explanation for disregarding this relevant evidence in order for the Court to

have the ability to determine whether proper consideration was given to the record evidence and the ALJ's assessment of Plaintiff's testimony. *Id.*

The ALJ also determined that Plaintiff's statements and testimony "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 13). However, this again is the full extent of the ALJ's explanation for rejecting Plaintiff's statements and testimony as evidence of her seizure activity. Examples of such statements in the record include that Plaintiff told Dr. Carey that she experienced a seizure two days after Thanksgiving 2009. (R. 454). Plaintiff has also stated on numerous occasions that she experiences seizures regularly, even while medicated. (R. 49-54, 394, 398, 449-453). This evidence shows Plaintiff's seizure activity is not limited to the four (4) instances which the ALJ determined to be the "extent of [Plaintiff's] seizure activity." (R. 11). When disregarding this evidence, the ALJ must provide the Court with an explanation as to why the evidence was not considered and/or rejected so that the Court can determine whether proper consideration was given to the record evidence. *Id.* As stated above, the record contains evidence which supports Plaintiff's claims, regarding the extent of her seizure activity, which was not addressed by the ALJ.

The ALJ further stated that "there is no evidence that the [Plaintiff's] seizures are uncontrolled." (R. 12). Again, the ALJ did not provide any explanation for this conclusory determination that Plaintiff's seizure disorder is controlled. The Commissioner argues that Plaintiff's medical records show that "her seizures may be related to her alcohol and/or drug

use." (Defendant's Brief at 15). There is no evidence that the ALJ adopted this rationale. Moreover, there are a number of documents in the record which contradict the Commissioner's argument. For example, Plaintiff's medical records pertaining to her seizure which occurred on January 14, 2006, show that she had not been under the influence of any drugs or alcohol and that her Dilantin level was at a therapeutic level of 12.2. (R. 325). Similarly, as noted above, Plaintiff told Dr. Carey that she experienced a seizure two days after Thanksgiving 2009. (R. 454). Dr. Carey noted that Plaintiff's Dilantin level was at a therapeutic level of 11 ug/ml the week prior and that "electrodiagnostic studies . . . revealed the presence of a sensory polyneuropathy." (R. 454). Furthermore, some of Plaintiff's pre-2006 seizure activity suggests that she tested negative for drugs or alcohol and her Dilantin level was therapeutic. (R. 279, 286). However, the ALJ made no reference to these instances, and did not explain his reasons for disregarding these recorded instances of seizures. These instances display a pattern of seizure activity while Plaintiff was medicated and not under the influence of any alcohol or drugs, as well as shed light on the credibility of Plaintiff's statements and testimony and the opinions of her treating physicians. Again, the ALJ is required to provide some explanation for disregarding this relevant evidence in order for the Court to have the ability to determine whether proper consideration was given to the record evidence. *Id.*

## IV.      Conclusion

In this case, the VE testified that Plaintiff could not work, and is permanently disabled if her seizure disorder is not controlled. (R. 54). The ALJ determined that there is

"no evidence that the claimant's seizures are uncontrolled." (R. 12).   In doing so the ALJ disregarded signed documents from both Dr. Carey and Dr. Shetty stating the Plaintiff is permanently disabled.  Furthermore, the ALJ made no reference to the letters sent by Dr. Carey, in which Dr. Carey definitively stated that it is his medical assessment that Plaintiff's seizure disorder is not controlled.  He also minimized the actual extent of Plaintiff's seizure history, disregarded other instances in the record of seizure activity while Plaintiff was medicated, and Plaintiff's statements themselves.  He did so without the requisite explanation to allow this Court to review whether proper consideration was given to the evidence of record. *Id*.

"Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001).

When reviewing a decision of the Commissioner to deny benefits, it is not this Court's function to substitute its judgment for that of the Commissioner.  The Commissioner's decision in the present case may otherwise be correct and nothing in this Memorandum Opinion should be taken to suggest that this Court has presently concluded otherwise.  However, in the absence of sufficient indication that the ALJ considered all the medical evidence of record, including the assessments and letters from Dr. Shetty and Dr. Carey, the Court cannot satisfy its obligation to determine whether or not the Commissioner's decision is supported by substantial evidence.  Accordingly, this case will be remanded to the

Commissioner for further consideration and/or proceedings consistent with this Memorandum Opinion.

An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOYCE ANN HOWELL               )
                                        )
           Plaintiff,             )
                                          )
           v.                   )      02:  10-cv-1302
                                          )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security,   )
                                          )
           Defendant.       )

**ORDER OF COURT**

    **AND NOW**, this  _28th_  day of  __June__ , 2011, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

    1.    Plaintiff's MOTION FOR SUMMARY JUDGMENT (Document No. 6) is
          **GRANTED**.  The case is remanded for further proceedings in accordance with
          this Opinion.

    2.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No 9)
          is **DENIED**.

    3.    The Clerk will docket this case as closed.

                            BY THE COURT:

                            s/Terrence F. McVerry
                            United States District Court Judge

cc: Richard Urick
  McMillen, Urick, Tocci, Fosse & Jones
  2131 Brodhead Road
  Aliquippa, PA 15001
  Email: rurick@yourlawfirm.net

  Albert Schollaert
  United States Attorney's Office
  700 Grant Street
  Suite 4000
  Pittsburgh, PA 15219
  Email: albert.schollaert@usdoj.gov